UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:23-cr-30014-1-MGM |
| | ) | |
| LOUIS R. MASASCHI. *et al.*, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM FOR**
**DEFENDANT LOUIS R. MASASCHI**

*"They have caused significant negative impacts on many in Springfield, beyond the banks and lenders named as victims. Their actions have left many downtown buildings vacant, abandoned, and in worsening disrepair over many years, resulting in substantial loss of value, increases in rehabilitation costs, and ultimately, a worsening economic picture for Springfield's downtown."*

Erica Swallow
President, Springfield Preservation Trust

Fourteen fraudulent loans seeking more than sixty million dollars in funds and resulting in more than eighteen million dollars of loss. Dozens of false financial records including phony rent rolls and inflated profit and loss statements. Scores of forged lease documents bearing the fake signatures of doctors, lawyers, and business operators.

Because the defendant – over an approximately four year period between 2016 and 2019 - led a staggering series of repeated, flagrant, and escalating frauds, the Government recommends that the Court sentence him to 63 months of imprisonment, 36 months of supervised release, a Guidelines range fine, restitution and forfeiture of $18,203,030 each, and a $300 special assessment.

The requested sentence reflects the seriousness of his offenses, promotes respect for the law, provides just punishment for his crimes, affords adequate deterrence for others, and protects the public from his further crimes.  18 U.S.C. § 3553(a)(2)(A)-(C).

1.    Introduction

On April 22, 2025, the defendant pleaded guilty, pursuant to a written Plea Agreement with an agreed-upon Statement of Facts, to Count One (Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 371) and Counts Two and Three (Wire Fraud in violation of 18 U.S.C. § 1343). Presentence Investigation Report dated June 8, 2026 ("PSR"), ¶ 258.  The Probation Department has correctly determined that the defendant's Advisory Sentencing Guidelines range is 63 to 78 months, based upon a Total Offense Level of 26 and a Criminal History Category of I.

The United of America by and through Leah B. Foley, United States Attorney and Caroline Merck and Steven H. Breslow, Assistant United States Attorneys, recommends that the defendant be sentenced as follows:  63 months of imprisonment; 36 months of supervised release, a fine within the Guidelines range of $25,000 to $1,00,000; restitution and forfeiture of $18,203,030 each; and a $300 special assessment.[1]

2.    The Defendant Merits The Recommended Guidelines Sentence

a.    Legal Principles

As the Supreme Court explained in *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable

---

[1] As part of the Plea Agreement, the Government agreed to dismiss Count Four (Aggravated Identity Theft in violation of 18 U.S.C. § 1028A) following the imposition of the defendant's sentence. D.99, p. 2.  As part of the Plea Agreement for the defendant's co-defendant and wife, Jeannette Norman, the Government agreed to recommend that Norman serve her sentence consecutive with (either before or after) the defendant's sentence.  D.119, p.4.

Guidelines range, and then consider all of the factors in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested. The district court may not presume that the Guidelines range is reasonable, but must make an individualized assessment based on the facts presented. *Id.* at 597.

If the district court determines that a non-Guidelines sentence is warranted, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Id.* Obviously, a major departure requires greater justification than a minor deviation. *Id.* The district court's explanation must allow for appropriate appellate review and promote the perception of a fair sentencing. *Id.*

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Starting with the Guidelines' framework helps promote uniformity and fairness. *United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010). In most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Molina-Martinez*, 136 S. Ct. at 1346.

In this case, the recommended Guidelines sentence best represents the statutory sentencing goals articulated in 18 U.S.C. § 3553(a). As the Supreme Court observed in *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), the sentencing judge and the Sentencing Commission are carrying out "the same basic 3553(a) objectives, the one at retail, the other at wholesale." In other words, the Sentencing Commission's guidelines are a "rough approximation of a sentence that might achieve § 3553(a)'s objectives." *Id.* at 2465. *See Gall*, 128 S. Ct. at 596 (stating "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and initial benchmark.").

3

> b.    The Requested Sentence Reflects the Seriousness of the Defendant's Offenses and Provides Just Punishment

The nature and circumstances of the offense are extremely serious and warrant just punishment.  *See* 18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A). As set forth in far greater detail in the agreed-upon Statement of Facts attached to the Plea Agreement, the defendant led a massive, multi-year loan fraud conspiracy that victimized numerous lenders, including two community credit unions, sought to gain over $60 million, and resulted in over $18 million in restitution.  D.99, pp.11-14; PSR, ¶¶ 9-16 (setting forth fraudulently obtained loans and losses in a chart at page 16) and 269 (setting forth restitution).

In this complex and sophisticated scheme,[2] the defendant and his two co-defendants - his wife Jeannette Norman ("Norman"), and his sister-in-law Christine Gendron ("Gendron") - methodically and repeatedly submitted a series of false documents to obtain loans for various properties owned by businesses operated by Masaschi and Norman.

First, they submitted false loan applications that overstated the income generated by their properties, which they generally offered as collateral for the loans.  These applications gave lenders the false impression that the defendant and his co-conspirators were operating a lucrative real estate

---

[2] In the Plea Agreement, the defendant reserved the right to contest the two-level sophisticated means enhancement pursuant to USSG § 2B1.1(b)(10)(C).  The Probation Department correctly applied this enhancement. PSR, ¶ 183.  This enhancement applies because the defendant operated a complex scheme involving multiple steps, which taken together, constituted sophisticated means that mad the scheme "more effective and difficult to thwart." *United States* v. *Ponzo*, 171 F.4th, 507, 513, (1st Cir. 2026); *United States v. Foley*, 783 F.3d 7, 25-26 (1st Cir. 2015) (holding that the defendant's use of "fraudulent" documents, "fictitious down payments," and "fake checks," taken together, constituted sophisticated means) and *United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009) (stressing that a "scheme may be sophisticated even if the individual elements taken alone are not")).

business empire when in fact, the properties were generally losing money and unable to generate enough income to support the loan payments.

Second, they submitted false business records to support the loan applications. These records generally consisted of false rent rolls (lists of tenants with their monthly rent and expiration dates) and profit and loss statements ("P&Ls") that overstated the income generated by the properties. In one instance, they provided a fictitious, cut-and-pasted, Morgan Stanley account statement showing an account balance of $2,438,250.03 when the actual account balance was only $250.03. PSR, ¶ 28. In other instances, they provided various lenders with false financial information and documents, including a lease agreement with a forged signature, for a non-existent company, Capital Maintenance. PSR, ¶ 49-50, 66-67, 70, 101-02, 117, 120, 122.

Third, when the lenders sought verification of the financial information in the rent rolls and P&Ls, they created and submitted a series of false loan documents - false lease agreements, lease extensions, tenant estoppel certificates, and subordination, non-disturbance, and attornment agreements ("SNDAs") - that bore the forged signatures of tenants, many of whom were doctors, lawyers, and business operators. Some of these supporting documents were even falsely notarized to add an additional veneer of authenticity. In some instances, they submitted these documents directly to the lenders after creating them, but in other instances, they took advantage of unsuspecting mortgage brokers to distance themselves from the fraud, knowingly allowing these brokers to pass along false rent rolls and lease agreements on their behalf.

Importantly, all the victimized lenders carefully considered and relied on the accuracy of these false rent rolls and lease agreements in their loan decisions because the value of each property depended significantly on the amount of rent that its tenants could pay the owners (Masaschi and Norman and the various entities that they created to conduct their business), and thus reflected

their ability to repay these loans.

This type of commercial loan fraud, specifically misrepresenting the value of rental income and tenant occupancy, misleads lenders like the victims into approving loans they otherwise would *never* normally issue based on industry practice standards. Unsurprisingly, after obtaining this ill-gotten financing, the defendant and Norman defaulted on the loans, sometimes after making no payments at all. This pattern of defaults left behind a trail of devastation in form of abandoned collateral properties, institutional crises, and significant financial losses.

The defendant, Norman, and Gendron brazenly executed this lucrative scheme over and over again, moved from lender to lender, and ultimately sought an astounding total of over $60 million dollars in loans with varying levels of success. *See* PSR, ¶ 16; D. 99 (Plea Agreement), ¶ 13.  In order to continue their pattern of borrowing while actively defaulting on loans, the trio operated their commercial real estate business to conceal their fraudulent activity for as long as possible. For example, rather than use a single company and bank account, they organized a network of over a dozen limited liability companies ("LLCs"), employing a different LLC and corresponding bank account for each collateral property.  Additionally, rather than borrow money from a single victim institution, they strategically shifted between commercial lenders (occasionally using one commercial lender to refinance a prior loan from another lender) to prevent any single lender from growing too suspicious and identifying the fraud.

Between 2016 and 2019, the defendant and Norman submitted a remarkable eighteen loan applications, with a total loss of $20,099,295 and a total attempted loss of $60,123,000.  PSR, ¶ 16. The defendant and Norman concede that they now owe $18,203,030 in restitution (jointly and severally).  PSR ¶ 269.

The requested sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A). The defendant's conduct was serious, deliberate, and damaging. He defrauded a wide range of institutions to obtain loan packages for his businesses. He chose to do this on at least eighteen occasions. His aggregated *attempted* loan package over three years was above $60 million dollars. On two occasions, he preyed on small community credit unions that serve communities in Western Massachusetts. And to undermine the risk assessments and audits these and other financial institutions regularly undertake to protect themselves during the loan process, he forged the signatures of prominent Western Massachusetts community members, including doctors, lawyers and even a state senator, to cover his tracks.

The defendant made the deliberate choice to make repeated false representations to obtain funding for his businesses. The scale of his fraud, with over $18 million in losses, is staggering. Given such conduct, a Guidelines sentence of 63 months incarceration reflects the seriousness of his offenses and provides just punishment.

c.      The Government's Recommended Sentence Affords Adequate General Deterrence and Protects Against Future Crimes by Masaschi.

Further, the requested sentence is required to afford "adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B)-(C).

Specific deterrence is necessary to ensure that the defendant will not engage in similar frauds in the future. The defendant is a persuasive salesman and highly resourceful entrepreneur. However, he now reports very limited assets and a negative monthly cash flow of $1,480. Given his current financial situation, there is a real risk that the defendant will return to the fraudulent

methods that gave rise to these charges to pay off his debts and embark on future projects to regain his financial footing. A lengthy term of imprisonment is, therefore, necessary to deter him from engaging in future fraudulent conduct.

In addition, a significant term of imprisonment is also necessary to deter others from such conduct. As this case makes clear, although lenders conduct underwriting, the loan process rests upon a degree of trust placed in applicants to submit true statements and legitimate supporting documents.   [Here, of course, the defendant circumvented even the underwriting process by submitting false lease documents with the forged signatures of tenants].  If there are no significant consequences for lying and submitting fake documents, it would potentially have severe effects on the lending industry.

Most affected by this kind of lending fraud are small lenders and credit unions. Credit unions are, by design and mission, often heavily focused on serving underrepresented, low-income, and marginalized communities. They are often the primary financial institutions in underserved areas, providing essential, affordable banking services where traditional banks may not operate. They are more generous than traditional banks because they do not have shareholders. Credit unions return surplus revenue to members through lower loan rates, higher deposit yields, and fewer fees. They focus on financial wellness over profit.  Frauds like this one are particularly devastating to these institutions and the communities they serve.

As Freedom Credit Union ("FCU") wrote in its Victim Impact Statement ("VIS"), the defendant's fraud "resulted in a significant loss that cannot be overlooked."  FCU explained:

> These losses are resources that otherwise would have been directed toward expanding homeownership initiatives, growing small businesses, or deepening our financial education programs.  Instead, we were forced to divert critical resources to address fraud and implement added safeguards to protect our members.

FCU VIS, p.1.

Similarly, as Workers Credit Union ("WCU") wrote in its VIS:

The fraudulent activity committed by the defendant resulted in a loss exceeding $5,000,000. This loss has had a profound and far-reaching impact, not only on our institution but on the members and communities who depend on us.

Because we are member-owned, this loss is not absorbed by corporate shareholders; it directly affects our members. The funds lost represent resources that would otherwise have been used to provide affordable loans, offer competitive interest rates, and maintain low fees.

As a result of this fraud, our members have experienced a diminished capacity for these benefits. The financial strength of our institution has been weakened, and decisions that would otherwise prioritize member value have had to be reconsidered.

WCU VIS, p.1.

A sentence of a significant period of incarceration — 63 months — will also send an important message. It will make clear to those who work in the banking industry, business investors, white collar criminals in general, and the public at large, that this type of fraudulent conduct will have truly meaningful consequences. Moreover, a prison term will make clear that those who carry out "white collar" crimes to obtain money will not be treated less seriously than other types of crimes that are punished with significant prison sentences.

As this Court stated in *United States v. Hanibal Tayeh*, 18-CR-3002-MGM:

[T]here is a need for general deterrence on this type of financial crimes -- crime and a need to apply the 3553(a) sentencing factors fairly across the board for all people at all economic levels who come before this Court. People who are committing financial high level crimes who have money, who steal more money, who have businesses, who build bigger businesses, who are dealing on that upper level, are not to be accorded any type of favor that is different from people on the lowest economic rung who come before this Court with nothing. No one, no matter how financially well off, is entitled to victimize others. And this is victimization in the financial

9

sense. There are consequences. General deterrence is a recognized factor to consider in our justice system.[3]

    d.    <u>The Defendant's Personal History and Characteristics Warrant the Sentence</u>

Lastly, there is nothing about the defendant's personal characteristics and background that warrants a sentence of less than 63 months in prison. He had a privileged upbringing in coastal Massachusetts and attended a highly selective waterfront prep school. From there, he went on to college at the oldest military institution in the country, where he was an accomplished student-athlete in the Corps of Cadets, successfully earning his degree while also competing in NCAA lacrosse and hockey. *See* Exhibit A. Within three-years of graduation from Norwich, the defendant was already well on his way to running a successful restaurant group on Cape Cod. He soon expanded his business to six restaurants. When his first marriage dissolved, Masaschi had no trouble making a change and pivoting his career. He sold his restaurants and moved to New York City. There, he quickly obtained a high-level sales position for an international company. In that role, he excelled. He was even entrusted with a premier client, the Goldman Sachs Group, Inc., a leading global investment banking, securities, and asset and wealth management firm. Eight years later, the defendant pivoted his career back to Massachusetts restaurants and real estate along with his soon-to-be wife, a successful high-level employee at Goldman Sachs.

Prior to this fraud scheme, Masaschi was an accomplished businessman. His academic career and the first 20 years of his work life are easy evidence that he possesses an abundance of natural ability, talent and resourcefulness. Simply put, nothing  - other than Masachi's own greed, ego, and disregard for the law - can explain the defendant's conduct of this sophisticated scheme to defraud.

---

[3] Transcript of sentencing, January 14, 2025, at 54.

The Government expects that the defense may assert at sentencing that his medical needs, namely a heart condition, warrant a non-incarcerative sentence. But none of the medical needs outlined in the PSR are of such a nature that they cannot be handled within the Bureau of Prisons ("BOP") system. As the Court is aware, BOP has medical facilities available to Masaschi if medical treatment became necessary while he is incarcerated. As the defendant cannot demonstrate that BOP is unable to handle any medical needs, he cannot rely on his medical issues as a basis for a reduced sentence in this case.

    e.    Restitution for the Defendant's Victims.

Pursuant to the Plea Agreement, the defendant has agreed to pay restitution to the victim financial institutions in this case. After a lengthy conference between his defense forensic accountant and an FBI forensic accountant, the defendant agrees he owes $18,203,030 as follows:

| Victim | Amount |
| --- | --- |
| Security Mutual Life Insurance Co. | $1,554,378 |
| Freedom Credit Union | $5,370,038 |
| Grand Coast Capital Fund I, LLC | $1,639,302 |
| MCREIF SubREIT, LLC, d/b/a Money360 | $   25,000 |
| Workers Credit Union | $1,856,484 |
| Community Loan Servicing, LLC (d/b/a Silver Hill Funding, LLC) | $1,323,546 |
| New York Income Partners, LLC | $5,640,460 |
| U.S. Income Partners | $  793,822 |

    f.    Avoiding Unwarranted Sentencing Disparity

Each defendant who appears before the Court for sentencing brings his or her own unique circumstances based on the nature of the crime committed and his or her own personal history.

And because the statutory sentencing framework provides for the consideration of those unique circumstances in each case, *see* 18 U.S.C. § 3553(a), it is inherently difficult to directly compare sentences received by different defendants. As stated in the PSR, for defendants who received a term of incarceration with a primary guideline of §2B1.1, and an offense level was twenty-six, the average period of incarceration was 49 months and the median was 51 months.[4]  PSR ¶ 273.

But the circumstances here warrant a sentence more than the average and median. In this case, the amount of the loss was well above $9.5 million. Thus, Masaschi falls at the higher end of the range for the applicable Guideline provision, which extends from $9.5 million to $25 million (U.S.S.G. §2B1.1(b)(1)(K)). Thus, a sentence above the average and median is warranted.

Moreover, as noted above, the defendant did not just engage in an isolated instance of fraud, but repeatedly engaged, over a period of four years, in multiple rounds of fraud to obtain funds for himself and his business.  He made false representations to multiple institutions and brokers, submitted false documents (such as rent rolls) to back up his false representations, and then he submitted additional false documents (such as lease agreements with forged signatures) to substantiate the false documents.  He doctored his Morgan Stanley account to make a $250.03 balance look like a $2,438,250.03 balance and he created a false company, Capital Maintenance, that purpotedly paid thousands of dollars of rent.  Thus, taking into consideration the unique circumstances of this case, consistent with 18 U.S.C. § 3553(a), a 63-month sentence is appropriate.

In addition, in the interest of avoiding any sentencing disparity, the Government has looked to other recent cases in this court involving similar fraudulent conduct. A 63-month sentence is

---

[4] If all defendants who did not receive a term of incarceration are included, the average and median sentences are both 48 months. *See* PSR ¶ 273.

still consistent with other defendants recently sentenced by this Court for criminal fraud given the much greater scale of the fraud here. In *United States v. Gerald Burke*, Case No. 22-cr-30011-MGM, the defendant stole only $1.4 million and the Court sentenced him to 31 months of incarceration. In *United States v. Antonio M. Strong*, Case No. 20-cr-30033-MGM, the defendant's fraud scheme caused a loss of just over $2 million and he was still sentenced to 34 months in prison. In *United States v. Roxanne Tubolino*, Docket No. No. 14-cr-30047-MGM, the defendant took over $1.5 million and was sentenced to 39 months of incarceration.  In *United States v. Phillip Williams*, Case No. 19-CR-30016-MGM, the defendant defrauded five victims (and the Internal Revenue Service) of approximately $2.6 million and was sentenced to 66 months of imprisonment.

Here, the loss amount in this case is much greater than the losses in each of these recent cases. A sentence of 63 months would be roughly twice as long as most of them, appropriately reflecting the exponential difference in the loss and the increase in loss amount category.  In this way, a 63-month sentence here would avoid unwarranted sentencing disparity with these cases.

3.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a term of imprisonment of 63 months, three years of supervised release, a fine within the guidelines range, restitution of $18,203,030, forfeiture, and a $300 special assessment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Caroline Merck*
CAROLINE MERCK
Assistant United States Attorney
U.S. Attorney's Office
District of Massachusetts
caroline.merck@usdoj.gov

13

By:    */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant United States Attorney
U.S. Attorney's Office
District of Massachusetts
steven.breslow@usdoj.gov

Dated: June 8, 2026