UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 23-cr-30014-MGM |
| | ) | |
| LOUIS R. MASASCHI, | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING RECOMMENDATION

### I.   INTRODUCTION.

On April 13, 2023, the Grand Jury returned an Indictment, charging the Defendant with Conspiracy to Commit Wire Fraud (Count 1), Wire Fraud (Counts 2 and 3), and Aggravated Identity Theft (Count 4).  On April 22, 2025, the Defendant pled guilty to Counts 1 through 3 of the Indictment.  Count 4 was dismissed by the government pursuant to the Plea Agreement.

The maximum penalty is five years on Count 1 and thirty years on Counts 2 and 3.  There is no mandatory minimum sentence.  The Defendant submits that a sentence of twenty-one (21) months of imprisonment and five (5) years of supervised release is sufficient, but not greater than necessary, to effectuate the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

### II.   THE INSTANT OFFENSE.

From 2009 to 2022, the Defendant owned JLL Realty Developers, LLC, a company that owned and managed over two dozen residential and commercial buildings in western Massachusetts and northern Connecticut.  The Defendant's wife, Jeannette Norman, was a managing partner, and his sister-in-law, Christine Gendron, was the

1

bookkeeper.  The company also employed two property managers and two maintenance workers.

To finance new properties and refinance existing ones, the Defendant used some of his existing properties and loans as collateral, also known as cross-collateralization. He also personally guaranteed several of the loans.  In obtaining financing, the Defendant submitted rent rolls and leases that contained false information.  In many instances, the rent rolls inflated the amount of rent a tenant was paying or the term of their lease. Several leases submitted as proof of income were either forged or didn't exist.

Given the inherent shortfalls in rent, the Defendant inevitably defaulted on some of the loans.  The cross-collateral nature of the loans across multiple properties resulted in the default of multiple loans at once, even if he was in good standing on the other loans.

Nine lenders issued loans to the Defendant having relied on false financial documents.  Of those lenders, eight suffered an "actual loss" as defined by the Sentencing Guidelines.  They were (1) Security Mutual, (2) Freedom Credit Union, (3) New York Income Partners, (4) U.S. Income Partners, (5) Silver Hill Funding, (6) Grand Coast Capital, (7) MCREIF, and (8) Workers Credit Union.  Other lenders either did not receive false documents, did not issue loans, or did not suffer an "actual loss" as defined by the Guidelines.

Given the volume and complexity of the financial transactions pertaining to the loans, calculating the loss amount was an enormous task that both parties endeavored to tackle separately and collaboratively.  Although the Statement of Facts and PSR state that the loss amount was $20 million, this number contains amounts that are expressly

excluded under the Sentencing Guidelines.  Pursuant to USSG § 2B1.1, cmt. n.3(D)(i), interest, finance charges, late fees, penalties, and similar costs are not part of the loss amount.  The loss amount stated in the Statement of Facts and PSR contained millions of dollars of interest, penalties, and late fees that should have been excluded.  Moreover, that figure also contained amounts that were either unsupported by evidence or were never incurred.

**The actual loss amount based on the definition set forth in the Guidelines is $10.1 million.**[1]  This amount still exceeds the Guidelines threshold of "more than $9.5 million."  See USSG § 2B1.1(b)(1).  A chart summarizing the loss amount by the Defendant's forensic accountant, Richard A. Royston, C.P.A., is attached to this Memorandum.  Mr. Royston's curriculum vitae is also attached as an exhibit.

The restitution amount is higher (approximately $18 million) because it includes figures excluded from the loss amount calculation, like interest and penalties.  Several of the Defendant's loans carried incredibly high interest rates of 16%.

## III.    PERSONAL HISTORY.

The Defendant is 59 years old.  He was born in Hyannis, Massachusetts, and was raised in a home his father built in Wareham.  His father owned and operated a construction company on Cape Cod, and his mother was a third-grade teacher in Wareham.  They are both deceased.  The Defendant attended high school at Tabor Academy in Marion, Massachusetts, where he was a standout athlete.  After high school, he attended Norwich University, a military academy in Northfield, Vermont.  He was in the University's Air Force Division but did not enlist after graduation.  After college, he

---

[1] Although the loss amount stated in the Statement of Facts was approximately $20 million, the Defendant retained the right to challenge this amount pursuant to the Plea Agreement.

worked for his father's construction company as an estimator.

In 1993, he opened his first restaurant in Sandwich, Massachusetts, and within a few years opened five more on Cape Cod.  In 2000, after divorcing his first wife, he sold the restaurants and moved to New York City, where he obtained his real estate license and became a leasing agent for residential properties in New York and New Jersey.  Soon after, he began working for the Aramark food service company in New York City.  Through his work, he met his current wife, and they began living together outside the city.  In 2008, they had their first child and moved to western Massachusetts to be closer to his wife's family.  They married in 2009 and moved to Longmeadow.

In 2019, he and his wife purchased The Meeting House Restaurant in Longmeadow.  They operated it until it went out of business in June 2025.

The Defendant currently lives with his wife and son in Longmeadow.  Their son Louis is nineteen years old, recently graduated high school, and works at Balise Chevrolet transporting vehicles.  The Defendant has two brothers and two sisters: Paul Masaschi, 62, drives an oil truck for Cape Cod Gas and resides in Plymouth, Massachusetts; Nancy Masaschi, 60, is a vice president of hospital management in Chicago, Illinois; Lisa Heaney, 57, is the vice president of sales for Aramark and lives in Medway, Massachusetts; and Thomas Masaschi, 54, is a real estate developer in Rochester, New York.

## IV.   HEALTH HISTORY.

The Defendant has consumed alcohol daily since approximately 2017.  In 2019, he suffered what he thought was a heart attack, but a specialist later diagnosed it as an extreme stress reaction.  He stopped drinking for a period that year but eventually

4

resumed.  His drinking became substantially worse in the last three years.

## V.      CRIMINAL HISTORY.

The Defendant has a criminal history score of zero.  However, his Massachusetts record reflects various entries in the 1990s pertaining to his father's construction business.  When his father ran into financial trouble, he listed the Defendant as the president of the company in name only, even though the Defendant had no managerial role.  The Defendant, therefore, was on the hook for the company's nonpayment of wages and failure to comply with unemployment and workers' compensation requirements.  All charges were dismissed outright, dismissed upon the payment of restitution, or continued without a finding of guilty.

## VI.     THE DEFENDANT'S SENTENCING RECOMMENDATION.

Although the loss amount in this case was approximately $10.1 million, this was not money that the Defendant pocketed.  The loans went directly to purchasing and refinancing property that he rented to tenants.  However, the Defendant obtained the loans, in part, by inflating the current income of the properties.  Since the loans were based on inflated income projections, the rents collected were always less than or equal to the loan payments due.  Thus, it was only a matter of time before he defaulted.  Given the cross-collateral nature of the loans, when he defaulted on one loan, he defaulted on several, even if he was current with the other loans.

Rent collection was somewhat haphazard.  Many tenants paid rent based on oral agreements they made with the Defendant up to several years earlier.  Other tenants paid rent on an "as-can" basis.  He also had difficulty retaining tenants and finding new ones due to the condition of the buildings and economic downturn.  Not only was the

Defendant unable to turn a profit, he inevitably defaulted on the loans.

The Defendant's business decisions were clouded by addiction and pride. By 2017, he was drinking heavily on a daily basis. And rather than selling a property for a loss, he obtained alternative financing that allowed him to keep the properties at exceedingly high interest rates.

That is not to say that all of the Defendant's business ventures were marked by fraud and failure. The Defendant had numerous loans over many years that he dutifully paid. And for years he maintained many historic buildings in downtown Springfield and beyond that were rented by dozens of local businesses.

This was not a scheme that enriched the Defendant. He and his family have lived in the same modest home since 2012. They never had a lavish lifestyle. They do not have expensive cars, vacations, or jewelry.

The investigation and ensuing indictment decimated the Defendant and his family financially and emotionally. He lost his business, friends, and place in the community. He had to close the one business that wasn't part of the case: his restaurant The Meeting House. He is wracked by guilt daily, constantly pondering the fate of his wife, son, and sister-in-law. The more than two dozen letters of support from family, friends, and employees show the Defendant as a devoted father, generous friend, and involved community member.

The Defendant's Guidelines range set forth in the PSR is based on a total offense level of 26. However, this calculation is based on two, two-point enhancements for "sophisticated means" and "gross receipts," both of which the Defendant contends do not

6

apply in this case.[2]  The instant offense did not involve "sophisticated means" as defined by the Sentencing Guidelines because the Defendant's conduct did not go beyond what the First Circuit has characterized as "typical fraud."  Moreover, a "gross receipts" enhancement would be duplicative of existing enhancements (*i.e.*, double counting) and, therefore, inappropriate.  In light of the analysis contained in the Defendant's "Motion for Downward Departure," **the total offense level should be 22, and the presumptive Guidelines range should be 41-51 months.**

As part of the Plea Agreement, the government agreed that, despite a preliminary total offense level of 28, it would nonetheless recommend a lower Guidelines range of 63-78 months.  However, this range is still based on enhancements that should not apply.  As stated above, the total offense level should be 22 with an advisory Guidelines range of 41-51 months.

Nevertheless, the Defendant is requesting that this Court grant a downward variance.  Unlike most offenses involving fraud, the Defendant did not profit financially.  The submission of falsified records was selfish, to be sure.  But it was driven by a desire to keep his leaking business afloat, not to embezzle money for luxuries.  In this respect, the Defendant's conduct is mitigated, though not minimized.

The Defendant is a husband, father, and businessman.  However, this case all but ensures that he will never be in business again.  The damage to his reputation and psyche has already been immense.  In imposing a sentence, he urges this Court to consider his age, his worth to his family, and his not uncommon human flaws.  Therefore, he submits that a sentence of imprisonment of twenty-one (21) months and five (5) years of

---

[2] Pursuant to the Plea Agreement, the Defendant retained the right to challenge enhancements for "sophisticated means," "gross receipts," and "ten victims or more."

supervised release is sufficient, but not greater than necessary, to effectuate the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**RDAP Recommendation.**

The Defendant has consumed alcohol daily since approximately 2017. His alcohol abuse undoubtably contributed to his poor decision-making, as this was precisely the time he engaged in the conduct in this case.

After a health scare in 2019, he stopped drinking for a period but eventually resumed. In fact, it's been exceedingly worse the last few years. The stresses of the criminal investigation and ensuing indictment have increased his proclivity.

In this case, the Bureau of Prisons' Residential Drug Abuse Treatment Program (RDAP) would be appropriate and potentially lifesaving. It would allow him to address his issue and receive specialized treatment while serving his sentence. Therefore, he requests that this Court recommend his placement in RDAP in the judgment pursuant to 18 U.S.C. § 3621(e).

Respectfully submitted,
LOUIS R. MASASCHI
By his attorney,

/s/ Jared L. Olanoff
JARED L. OLANOFF
BBO# 661645
73 Chestnut Street
Springfield, Massachusetts 01103
Tel: (413) 731-7000
Fax: (413) 731-7002
E-mail: jared@olanofflaw.com

8

9

<u>CERTIFICATE OF SERVICE</u>

I, Jared L. Olanoff, hereby certify that on June 8, 2026, I filed a true and accurate copy of this document through the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jared L. Olanoff
JARED L. OLANOFF